**UNITED STATES of America, Plaintiff,**

v.

**Victor ACOSTA et al., Defendants.**

**No. 74–388–Cr–PF.**

United States District Court, S. D. Florida.

Dec. 31, 1974.

---

Ronald W. Rose, Sp. Atty., U. S. Dept. of Justice, Miami Strike Force, Miami, Fla., for plaintiff.

Dixon, Shear, Brown & Stephenson, Bernard H. Dempsey, Jr., Orlando, Fla., for Victor Acosta; Pearson & Josefsberg, Miami, Fla., of counsel.

Gonzalez & Lazzara, Anthony F. Gonzalez, Tampa, Fla., for Louis Llerandi.

Henry Gonzalez, Tampa, Fla., for Joseph Bedami and Anthony Crapero.

## ORDER OF DISMISSAL

FAY, District Judge.

### I. INTRODUCTION

This cause was tried before a jury for six days commencing November 11, 1974. Prior to the close of the case, three defendants were acquitted by the Court. The jury, thereafter, acquitted two defendants and convicted the four remaining defendants, Victor Acosta, Louis Llerandi, Joseph Bedami and Anthony Crapero.

During the prosecution's case, at the close of the prosecution's case, and again at the close of the entire case, the defense moved the Court to dismiss the case on the basis of government misconduct. In each instance, the Court agreed that it was within its jurisdiction and power to dismiss the case on this basis pursuant to McNabb v. United States, 318 U.S. 332, 63 S.Ct. 608, 87 L. Ed. 819 (1943); United States v. Russell, 411 U.S. 423, 93 S.Ct. 1637, 36 L. Ed.2d 366 (1973); Williamson v. United States, 311 F.2d 441 (5th Cir. 1962); United States v. Banks, 383 F.Supp. 389 (S.D.1974); and United States v. Mahoney, 355 F.Supp. 418 (E.D.La. 1973). In each instance the Court reserved ruling on the defense motion.

The jury's verdict of guilt leaves the issue squarely before this Court. The issue presented is whether or not "the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the Government from invoking judicial processes to obtain a conviction." United States v. Russell, 411 U.S. 423, 431, 93 S.Ct. 1637, 1643, 36 L.Ed.2d 366, 373 (1973). For purposes of this Order, the defendants are presumed guilty, and the only issue is whether the end, the defendants proven guilty, justifies the means, the prosecution's methods of investigating and prosecuting this case.

Because of the nature of these defense motions and the severity of the remedy sought, the Court deems it appropriate to discuss in some detail the factual circumstances upon which the motions and this Order are based.

### II

On November 14, 1972, Rudy Limauro, the government's principal witness in the instant case, was adjudicated guilty of conspiracy and sentenced to nine months incarceration to be followed by three years probation. Rudy Limauro was ordered to report to the United States Marshal to commence his incarceration on December 2, 1972. On December 1, 1972, Rudy Limauro requested and received an extension for his reporting time to December 14, 1972. On December 14, 1972, the Strike Force advised the Court that Rudy Limauro, acting as a good citizen and at great personal risk, had led state officials to the perpetrators of a vicious November 18, 1972 jewelry store robbery that resulted in the death of a Hollywood policeman and the wounding of a security guard. Based on this "cooperation" and Rudy Limauro's promise to continue to obey the law, the Court acquiesced by the joint request of the Strike Force and counsel for Rudy Limauro to suspend Rudy Limauro's nine month jail sentence.

Thereafter Rudy Limauro began working for the prosecution on the case, sub judice, and other cases, although he was not formally permitted to do so un-

til March 1973. Rudy Limauro's conduct and the prosecution's failure to disclose to the defense the facts regarding his conduct, are the gravamen of the defense motions.

### III

After the June, 1974 indictment in this cause, the defendants filed various pre-trial motions, including a Motion to Compel Disclosure of Existence and Substance of Promises of Immunity, Leniency or Preferential Treatment. United States Magistrate Michael J. Osman granted this motion on August 19, 1974. Judge Osman's Standing Discovery Order also required full compliance with Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

By letter to all defense counsel, dated November 1, 1974 (DL-# 1 for identification), the prosecutor advised that:

"UNITED STATES DEPARTMENT
OF JUSTICE

Washington, D. C. 20530

November 1, 1974
RWR: bfe

Anthony F. Gonzalez, Esq.
Gonzalez & Lazzara, P. A.
202 Governor
Tampa, Florida 33602

Re: U. S. v. Acosta,
et al.
74–388–Cr–PF
Disclosure of
Promises, etc. to
Government Witnesses

Dear Mr. Gonzalez:

Pursuant to the Government's obligation under United States v. Giglio, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972) and the Magistrate's Order entered in the above-styled case, it is the purpose of this letter to inform all defendants, through their respective counsel, of the existence of promises of immunity, lenience or preferential treatment, if any.

Insofar as Government counsel has been able to determine from a review of pertinent files and discussions with relevant investigative agencies, no promises of immunity, leniency or preferential treatment have been made to any Government witness, with one exception. Said witness will be identified for counsel and defendants immediately prior to trial.

The extent of any promise made to this witness are [sic] as follows:

Said witness on a prior unrelated charge entered a guilty plea in exchange for the Government's recommendation of sentence. Following the entry of the guilty plea, said witness was placed on probation and at that time, began actively cooperating with Federal agencies to develop prosecutable offenses.

No witness involved in this case has been promised any rewards, leniency in sentencing (other than previously stated), immunity, formal or otherwise, nor have any other agreements or understandings been entered into which in the opinion of Government counsel, would constitute preferential treatment.

No promises have been made to any witness regarding the diminution in any manner of any Federal, state or local taxes.

In response to a request from defendant Acosta as to promises of assistance from any Congressional Committee, etc., Government counsel, as a representative of the Executive Branch of Government, has no knowledge of any such promises to any Government witness.

This information is being supplied to you prior to trial and prior to the time required by Giglio, in an effort to facilitate the time required for trial.

Sincerely,

/s/ Ronald W. Rose
RONALD W. ROSE
Special Attorney
U. S. Department of Justice

ADDRESS:

111 N.W. 5th Street
Miami, Florida 33128
Tele: 350–4291 (305)"

The Court has concluded, for reasons which will be discussed, infra, that the prosecutor misrepresented the Government's treatment of its principal witness, Rudy Limauro, and that by so doing, the Government suppressed evidence. The Court's concern with this misrepresentation and suppression of evidence, is heightened by the fact that on the first day of trial the Court specifically ordered the prosecution team, two Strike Force attorneys and a DEA Special Agent, to obtain information as to the existence of any arrangements between Rudy Limauro and any law enforcement agencies.

### IV

Rudy Limauro testified on November 12 and 13, 1974. During direct examination, the prosecutor asked Rudy Limauro whether "the Government of the United States promised you anything for your testimony today?" Rudy Limauro replied in the negative. The prosecutor asked no additional questions in this area and took no steps to correct or amend Rudy Limauro's answer.

Although the Court is still uncertain of the full nature and extent of promises which have been made to Rudy Limauro, it is abundantly clear that Rudy Limauro's answer to the prosecutor's question was false; that the prosecution knew it was false; and that the prosecutor did not advise the Court and defense counsel of the falsity of the testimony.

### V

Rudy Limauro has committed many crimes. During his direct testimony, the prosecutor elicited from Rudy Limauro an admission that he had been convicted of seven separate felonies. Cross examination, revealed that, in fact, Rudy Limauro had been convicted of more than twenty felonies.

The Government has access to documents which precisely state the nature of each offense for which Rudy Limauro was arrested and/or convicted. Whether Rudy Limauro was convicted for seven or twenty felonies is not critical to this case. Critical, however, is that the Government permitted Rudy Limauro's incomplete, and, therefore, false answer on direct examination to stand.

### VI

During cross examination, Rudy Limauro admitted that warrants were outstanding charging him with the commission of four separate state felonies. He denied any knowledge as to why he had not been arrested since December 5, 1973, when the state warrants were issued. He denied any knowledge as to how the charges would ultimately be resolved. Rudy Limauro was confronted with sworn testimony he had given on September 4 and September 16, 1974 in unrelated federal trials. In his prior testimony, Rudy Limauro had denied knowledge of the existence of any state warrants. He explained this earlier denial by now stating that he first became aware of the warrants for the four state felonies after he testified on September 16th. Here again, the prosecution made no effort to correct or modify Rudy Limauro's statements, later shown to be false, that he was unaware of the state charges until after September 16, 1974, and that he had no idea as to how these state charges might be ultimately resolved.

Noting that the warrants had been outstanding for eleven months, the Court expressed its concern over the truthfulness of Rudy Limauro's testimony:

> THE COURT: Does the United States Government know at this point what has been said to Mr. Limauro about the pending state charges?
>
> Have any representations been made to him that he is not going to be prosecuted?
>
> How has he avoided being arrested? I mean, is the State just being a nice guy and because you happen to know where he is, they are saying, 'We are not going to arrest him'?
>
> Obviously, somebody has talked to somebody.

MR. ROSE: Your Honor, Mr. Limauro is presently under the witness protection program. He is in the custody of the United States Marshal.

THE COURT: All right. The Marshals have an obligation to protect him. They cannot do that very well when he is in the Dade County Jail. What has been done?

MR. ROSE: As far as I am aware, there have been no promises made to Limauro.

THE COURT: No promises; but the United States Marshal has hidden him out from state officers and they have not let state officers get near him.

MR. ROSE: That's not the fact as I know it.

THE COURT: Why hasn't he been arrested?

MR. ROSE: Your Honor, I have no information.

THE COURT: Let us find out. I think that is an obligation of the United States Government to find out. You do not have a right to secrete a witness and not tell the defendants or, at least, their lawyers, why certain things are being done. It is no secret.

There are charges out against the man and he has not been arrested. Somebody has said, 'Don't arrest him.'

If there has been some agreement made between the state and the United States Government, the defendants are entitled to know what the agreement is because it works to the witness' advantage.

MR. ROSE: Well, your Honor, maybe I am missing the point. I understood our obligation to be any promises that were made to the witness. If he is not aware of anything—I am not assuming there is anything. If there is some promise or some agreement to that effect and he does not know about it—

\*　　\*　　\*　　\*　　\*　　\*

THE COURT: What concerns me is what has the Federal Government done to aid or to foster the interests of the witness, because that, I think, they are obligated to tell you.

\*　　\*　　\*　　\*　　\*　　\*

THE COURT: As I say, I just cannot believe there has not been some arrangement worked out. It does not just happen.

\*　　\*　　\*　　\*　　\*　　\*

THE COURT: The record shows what we have done. I have called upon the Government to let you know what agreement there is. I am sure it is not going to go away. I am sure it is going to be a problem that is going to be with us until it is answered.

Two days later the problem was answered—but not by the prosecution. The answer came when the defense called Dade County Public Safety Department Officer Thomas Dazevedo.

Officer Dazevedo testified that during January, 1974, (some nine months before Rudy Limauro's September 1974 testimony) he found Rudy Limauro in the custody of the DEA and advised Rudy Limauro and DEA officers of the four outstanding warrants. Thereafter, on at least one occasion, Officer Dazevedo, DEA agents and Rudy Limauro discussed both the existence and disposition of the four state warrants. It was agreed that at some time after the trial of the case, sub judice, and at a time convenient to Rudy Limauro, DEA agents and Officer Dazevedo, Rudy Limauro would go to the State Attorney's Office, give a statement and Officer Dazevedo would state that he had no objection to the dismissal of the state charges. Any suggestion that Rudy Limauro's false testimony concerning the state warrants, or the Government's failure to reveal its falsity, was unintentional, is implausible in light of the fact that Officer Dazevedo was in Rudy Limauro's presence both at the DEA office three days before the commencement of this trial, and in court, during this trial on its second day.

Considering the repeated instances of false testimony being given by Rudy Li-

mauro, the Court is not surprised that Rudy Limauro testified falsely regarding the existence and future disposition of the state warrants. However, the Court is shocked at the Government's silence and acquiescence in this false testimony. If not for the uncontroverted defense testimony of Officer Dazevedo, Rudy Limauro would have perpetrated another fraud upon this Court. The two prosecutors and DEA agent present at trial should have known of the state court agreement and should have advised this Court and the jury of the falsity of Rudy Limauro's testimony.

### VII

On cross-examination of Rudy Limauro it was developed that he had personally participated in numerous criminal violations while in the employ of the Federal Government. Rudy Limauro did not file tax returns. He did not pay income tax on the $27,500 he received from the Government since early 1973. He personally used cocaine and delivered it to others for their use. He was an accomplice with one of the co-defendants in this case, Ronald Chandler, in a separate conspiracy involving marijuana. He filed false reports with his probation officer from December, 1972 until July, 1974, in that he did not report his travel nor his true sources of income and employment. He was an accomplice in a robbery of a jewelry store, murder of a police officer, and wounding of a security guard in November, 1972. (Greer and Gonzalez testimony). Rudy Limauro was apparently given "complete and total immunity", along with a blank check by representatives of the Government.

Although in possession of this evidence, the prosecutor continued to represent to the Court that no promises of preferential treatment had been made to Rudy Limauro. Not until the Court questioned the prosecution team at length did one of the prosecutors concede:

"Obviously, no one was going to prosecute him. Obviously, no one was going to mention it. He was an important witness in a case involving narcotics."

"As to his admission on the stand that he used narcotics, the practicality of this situation is no one is going to come into court, an agent is not going to grab him off the stand and hustle him down to the magistrate and indict him and try a case against him for that."

THE COURT: You and I know that.

MR. STEINBERG: That's correct.

THE COURT: Don't you think the Government has an obligation to tell the defense counsel that that is a consideration that has been given him?

### VIII

On May 4, 1973, the Federal Government paid Rudy Limauro $3,500 in advance for services rendered and to be rendered in this case. (Exh. DA-6) Rudy Limauro first denied that he was paid money in advance. The prosecutor never corrected Rudy Limauro, but it soon became evident that he was paid money in May for work to be done by him in this case during the next two months. Later Rudy Limauro acknowledged that he received the money in advance from the Government agents so that they could "get" the defendants. The money was not compensation to Rudy Limauro for what he had done and information he had gained, but rather it was to pay Rudy Limauro for meetings and conversations with the defendants which had not even occurred when the payment was made. It is also interesting to note that Rudy Limauro received this $3,500 advance payment simultaneously with, or immediately prior to, his development of the habit of regularly injecting cocaine into his body.

### IX

The defendants in this case were indicted in June, 1974. The evidence indicates that the conspiracy ended in late 1973. Yet, on cross-examination of Rudy Limauro, it was developed that pay vouchers showed that Rudy Limauro

was paid (in addition to being paid for his "services" in unrelated cases) approximately $150.00 per week through September, 1974 in connection with this case. After reviewing his vouchers and all of his personally dictated statements which bear the same case number, Rudy Limauro testified:

Q—Would you agree with me, though, based upon what ,you have just said, that it looks like you have been paid to testify?

5.1 A—That's what it looks like.

The Government made Limauro its ward. They literally "took him on to raise" with continued subsistence (above minimal standards), protective custody and a "license" to participate in all types of criminal activity with no fear of prosecution or punishment. Although bad enough, this was compounded by secrecy.

Again we are met with the Government's failure to disclose the facts concerning payments to Rudy Limauro to the Court and to defense counsel. The prosecutor, confronted with this failure, told the Court that the same DEA case number relates to other cases still under investigation. There is, however, no evidence to support this representation. To the contrary, the vouchers bear separate case numbers relating to separate cases for which Rudy Limauro received specific sums of money.

Under the terms of his probation, even as modified, Rudy Limauro was never authorized to violate the law. Yet the Federal Government permitted him to continually break the law. Never was this fact revealed to the Court during the period of probation. Never was it revealed to the Court by the prosecution during the trial. Never was it revealed to the defense.

The United States Probation Officer is a member of the Court's personnel. On December 14, 1972, Rudy Limauro was placed on supervised probation. This was a reward to Rudy Limauro for his alleged assistance to law enforcement agencies. It was done on the special request of officers of this Court and agents of the Federal Government. However, Rudy Limauro was placed under the same stringent requirements that apply to every probationer. He was required to associate only with law-abiding people, and the like. It was not until March 13, 1973, that this Court authorized Rudy Limauro's cooperation with federal agencies.

Unknown to the Court until Rudy Limauro testified on cross-examination was the fact that Rudy Limauro had been associating with such people as Ronald Chandler (a convicted felon) and Raymond Sheer (another convicted felon and "fence") between December, 1972 and March, 1973. The Court was not advised of Rudy Limauro's travels outside the Southern District of Florida during this same period of time in violation of the restrictions of his probation. The Court and its personnel were misled by Rudy Limauro's false monthly reports during this period. The DEA was apparently aware of Rudy Limauro's use of cocaine from May to December 1973, the period of alleged intense activity of the conspiracy at issue. Agents of the Federal Government knew of these probation violations as they were occurring and knew at the time of the trial of this case, that they had occurred. They did not disclose these facts to the Court, nor to defense counsel.

### X

At the conclusion of Rudy Limauro's direct testimony, the Government dropped its charge against Ronald Chandler as a defendant for lack of evidence. The Court must conclude that Rudy Limauro sufficiently implicated Chandler during private interviews with Federal agents prior to trial but that his testimony during the trial concerning Chandler suddenly fell short. This is the same Ronald Chandler with whom Rudy Limauro engaged in illegal narcotics activities while on probation in May, 1973. Rudy Limauro told the federal agents of these illegal narcotics activities. This information was never disclosed to the Court or defense counsel.

## XI

Considerable testimony was received concerning a meeting between Bernard Dempsey, one of the defense attorneys, and Rudy Limauro at the Fontainebleau Hotel in December, 1973. Rudy Limauro testified on direct examination that his false sworn statement was given to defense counsel on the day they first met at the hotel, and that he had been coerced into giving his statement that day. He stated that he was afraid that he would not be permitted to leave the hotel unless he gave a statement. It was not until Rudy Limauro was questioned on cross-examination that the Court learned that, in fact, Rudy Limauro met defense counsel one day, departed the hotel on the guise of seeing his attorney, and conferred instead with a DEA agent. Rudy Limauro voluntarily returned the next day and gave a false statement to defense counsel.

The Court is not here concerned with the credibility of the witness or the weight to be given his testimony. Nor is the Court directly concerned with why the DEA permitted Rudy Limauro to return and give a false statement, as opposed to not returning at all. The evil apparent to the Court and which is addressed here, is the failure, once again, of the prosecution to come forth and advise the Court and jury that Rudy Limauro testified falsely on direct examination concerning this incident. The Court is aware of testimony that agents reported all contacts with Rudy Limauro. If Rudy Limauro's cross examination admissions are true, there existed or should have existed, a record of Rudy Limauro's contact with a DEA agent the night before Rudy Limauro returned to the hotel to give his statement. If no such record of a contact exists, then it is possible that Rudy Limauro lied about seeing a DEA agent in between the two Fountainebleau meetings. In either case, this information should have been brought to the attention of the Court and jury.

## XII

Another matter which disturbs the Court is the deceit worked upon the State of Florida by an agent of the United States. James Gore, a State parolee in May, 1973 was contacted by one of the defendants asking Gore to assist him to import marijuana into the United States. Gore agreed to assist the defendant, but immediately contacted Special Agent Zisk of the U. S. Customs Service in Miami. Because Special Agent Zisk was aware of Gore's parole status, he contacted Gore's parole supervisor, Richard de Treville. Probation Officer de Treville cautioned Zisk that a State parolee could not be used for undercover work unless clearance was first obtained from the Florida Probation and Parole Commission. A few days later Zisk advised de Treville that the Commission had given its approval for Gore to work with Zisk.

Four months later Probation Officer de Treville learned from his supervisor that the Commission had never been requested nor had it ever consented to allow Gore to work with Zisk. When de Treville confronted Zisk with this information, Zisk acknowledged that he had not been completely truthful with de Treville.

The concern of the Court is that such conduct indicates an apparent philosophy that any means are justified which result in a criminal conviction.

## XIII

Early in the case, the Court ordered the Government to produce the vouchers which stated the amount of money paid special employees and the purposes for which the money was paid. The Court was of the opinion that its order had been complied with. It had not.

On November 14, 1974, Lauro Parente was called by the Government to testify. Parente was introduced to the defendants as a pilot from South America. Actually he was working for the Government in an undercover capacity. On

cross-examination, Parente denied that he received any money from the Government at any time except to cover his out-of-pocket expenses. However, two vouchers, dated in 1972 and 1973, indicated that he also received money in return for information and for services rendered. It was only then that the Court was advised that additional vouchers for Parente existed but had not been produced to the defense as ordered. A totally unacceptable excuse was offered for their non-production and the Court reminded the prosecution of its previous order. With the information in the custody of the DEA, the agency which investigated this case, it was not unreasonable to expect that it would be available in advance of trial.

Only after the prosecutor made his closing argument to the jury on November 18th, did the Government finally produce documentation evidencing additional payments to Parente by the Government for information and services rendered as well as for expenses. The witness had already been excused and all of the evidence had been received.

In accordance with this Court's orders prior to and during trial, the Government should have had all vouchers available at a time when they would have been useful to the defense.

## CONCLUSION

The four defendants, Victor Acosta, Louis Llerandi, Joseph Bedami and Anthony Crapero are guilty of serious criminal activity. Each deserves to be punished. Only the most serious overriding principles prevent such action. This situation causes great concern to this Court.

If we have learned anything from events of recent years, it is that those in authority must abide by the law or our way of life will surely perish. The end does not justify the means!

All those in law enforcement face the gravest tests in these times of rising crime. Their dedication is not in question nor their motives. To fulfill their mission demands great imagination and the broadest variety of tools. Informers are necessary; immunity to a known criminal is often dictated by the alternative; payment of funds for expenses or even for "services rendered" have been approved but surely there do exist limits. Are we to "fight crime with crime?" Do we change the rules because it seems expedient? In the abstract answers are obvious; in the instant cases very difficult.

Whether payments constitute impermissible "contingent fees" might be factually debatable but no one contests the absolute obligation of the prosecuting authority to inform a defendant of "all things of value or benefit" afforded a witness being relied upon in the trial. While it may be difficult for the attorney handling the trial to gather all such information, he must pursue it with diligence. It is not a cursory matter. With limited discovery in criminal cases, defendants and their counsel must rely upon the authenticity, accuracy, completeness and fairness of information furnished by representatives of the Government pursuant to the Federal Rules of Criminal Procedure and case law pronouncements (i. e. Brady v. Maryland, et al.). Failure to meet these requirements strikes at the very heart of "due process". As the Government involvement with an informer increases, so does the responsibility to properly advise the Court and defense counsel of the "true circumstances" surrounding such a witness.

It is "the duty of the courts in federal criminal cases to require fair and lawful conduct from federal agents in the furnishing of evidence of crimes" [U. S. v. Williamson, 311 F.2d 441, 444 (5th Cir. 1962)] and as Chief Judge Brown stated on page 445 of 311 F.2d:

" . . . recognized as is the role of informer in the enforcement of criminal laws, there comes a time when enough is more than enough—it is just too much. When that occurs, the law must condemn it as offensive

whether the method used is refined or crude, subtle or spectacular."

■ The use of Rudy Limauro, under these circumstances, and the failure of the Government to reveal "even the tip of the iceberg" to defense counsel, coupled with a similar "race for full disclosure" as to payments made to witness Parente, is *just too much.* Most reluctantly this Court concludes that dismissal is essential to our treasured precepts of "due process". It is, therefore—

Ordered and adjudged that the Defendants' Motion for Judgments of Dismissal be, and are, hereby granted.

Done and ordered at Miami, Florida this 31st day of December, 1974.