**UNITED STATES of America,
Plaintiff-Appellant,**

**v.**

**Victor ACOSTA, Louis Llerandi, Joseph Bedami, Jr., and Anthony Crapero, Defendants-Appellees.**

No. 75–1301.

United States Court of Appeals,
Fifth Circuit.

Jan. 29, 1976.
Rehearing Denied Feb. 23, 1976.

Robert W. Rust, U. S. Atty., Miami, Fla., Mervyn Hamburg, Atty., App. Section, Crim. Div., Dept. of Justice, Washington, D. C., for plaintiff-appellant.

Henry Gonzalez, Tampa, Fla., for defendants-appellees.

Before COLEMAN, CLARK and IN-GRAHAM, Circuit Judges.

COLEMAN, Circuit Judge.

A jury convicted Victor Acosta, Louis Llerandi, Joseph Bedami, Jr., and Anthony Crapero of conspiracy to import controlled substances into the United States, 21 U.S.C. § 952. After the verdict was returned, the District Court dismissed the indictment for prosecutorial misconduct, *United States v. Acosta*, 386 F.Supp. 1072 (S.D.Fla., 1974). Judge Fay was of the opinion that the conduct in question was so outrageous that due process principles absolutely barred the prosecution from invoking judicial processes to obtain a conviction. The government appeals, seeking reinstatement of the verdict.

The government contends that district courts have no authority to dismiss an indictment after a guilty verdict has been returned; but assuming such authority *arguendo* it further contends that dismissal was inappropriate here. We find it unnecessary to reach or decide the first point but we do agree that this dismissal was inappropriate.

## FACTS

The importation conspiracy of which appellees were convicted began on or about December 1, 1972, for the purpose of importing cocaine and marijuana from Colombia into the United States.

The star witness for the prosecution, an oft convicted felon named Rudy Limauro, was a paid informer who had played the role of a co-conspirator. At the trial the defense adduced virtually no evidence bearing upon the intrinsic merits of the case. Rather, the strategy was to discredit Limauro, coupled with the delivery of a withering attack upon the investigative and prosecutorial methods utilized by the government. This approach developed the following:

In November of 1972 Limauro had been convicted before Judge Fay of an unrelated crime. He was ordered to report in December for incarceration.

In the interim, Limauro gained favor with the authorities by disclosing the whereabouts of the perpetrator of a recent robbery-murder. At the request of federal agents and because of this cooperation, Judge Fay modified the sentence previously imposed on Limauro, placing him on three years probation.

Thereafter, Limauro began working as an informer for the federal Drug Enforcement Administration. This was done without probationary clearance for that activity, which did not come until March, 1973.

Based on the information compiled from Limauro, appellees and five others were indicted in June, 1974, for the drug conspiracy involved in this appeal.

Following indictment, appellees filed motions to compel disclosure of any promises of immunity and any preferential treatment to prosecution witnesses. In response, the government disclosed the following considerations accorded Limauro: (1) the aforementioned probationary sentence, (2) the pay Limauro received for his services, (3) a reward Limauro had received for another case he worked on, and (4) reimbursement for expenses he had incurred. The government denied any further promises of immunity, including a specific denial of any promises of favorable tax treatment.

Upon direct examination, while the government was putting on its case, Limauro testified that he had been given no promises from the prosecution except those above enumerated, plus the additional assurance that it would provide Limauro with a new identity following the trial. He admitted six prior felony convictions and swore that those were all the convictions he could recall.

On cross examination this testimony about the convictions was thoroughly exploded. Limauro was compelled to admit not six *but twenty* prior convictions, as well as several illegal activities for which he had not been convicted. He admitted violating probation while serving as an informer between December, 1972, and March, 1973; he admitted neglecting to report as income the $27,500 earned as an informer; he admitted using and distributing illegal drugs; and he admitted that his knowledge of where the jewelry robber could be captured stemmed from complicity in the fugitive's escape.

Limauro testified that he continued to receive payment for information even after the indictment was returned, payments that had the appearance of being given in return for testimony, although Limauro denied this aspect of the matter.

Limauro further admitted that state charges had been lodged against him in Dade County, but no indictments had been returned. When asked whether he expected those charges to be dropped because of his testimony, he said he had no idea how they would be resolved. Later testimony by a state officer tended to refute this assertion. In fact, Limauro knew that following the trial the state officer intended to ask the state's attorney to drop the charges. Of course, Limauro did not know whether the state's attorney would comply, but he did have reason to believe the charges would be resolved favorably.

With regard to these Dade County charges, Limauro stood by his testimony in an earlier case to the effect that he did not then know of the charges. However, the defense produced a witness who, nine months prior to the earlier trial, had informed the Drug Enforcement Administration of the charges against Limauro. Therefore, the least damaging assumption is that in this case and the earlier trial the Drug Enforcement Administration allowed the government to let false prosecution testimony go unchallenged; the most damaging in-

ference is that the Drug Enforcement Administration passed its information on to Limauro, and he perjured himself in the earlier trial and again in this case. Again, however, the jury in the instant case was made aware of the discrepancy.

Cross examination also disclosed Limauro had lied in his direct testimony regarding a meeting he had with appellee Acosta and his attorney.

The most damaging attack on Limauro's credibility concerned his role in the jewelry store robbery-murder. Despite the prosecution objection as to relevance, Judge Fay allowed lengthy cross examination about the robbery. Limauro testified that one of the perpetrators, Greer, approached him after the robbery, seeking help to escape. In response to the request, Limauro hid the jewels in his girl friend's home, discussed their value with a fence, and helped Greer escape in a camper. He did contact the police the night after the daytime robbery, a fact corroborated by the policeman to whom he reported. As a reward for Greer's capture, Limauro received $10,000.

When the defense called Greer as a witness he told a markedly different story. He testified that Limauro was more than the accessory after the fact; he accused Limauro of having planned the robbery, of having financially profited from it, and, in effect, of having betrayed Greer to gain a favorable reconsideration of his 1972 sentence.

On cross examination, Limauro reasserted three times that he had received no undisclosed promises of immunity. The trial court expressed incredulity at this testimony; aware of its obligation to reveal all such promises to the jury, the government agreed to a remedial instruction, which was read to the jury in the midst of the trial, as follows: "The Federal Government does not intend to prosecute Mr. Limauro for any illegal activity he testified to in his direct or cross examination."

In addition to the collateral assault on Limauro's credibility, and the related

failures of the government to disclose promises to witnesses and to correct false testimony, three other governmental indiscretions were cited by the District Court as requiring dismissal.

First, defense witnesses testified that James Charles Gore, Jr., a state parolee, was used as an informer although Florida law prohibits it. To gain consent from Gore's parole officer, a federal agent had falsely asserted that permission had been obtained from his [the officer's] superiors.

Second, the government was slow in producing requested pay vouchers indicating moneys paid to an agent in South America. Copies of the vouchers did not arrive until the prosecution had completed its closing argument, too late for the defense to use them in cross examination. Nevertheless, the defense had already been apprised of the amounts of money involved, and they did not question the accuracy of those amounts.

Third, the government conspicuously dropped its prosecution against defendant Ronald Chandler after Limauro's testimony. The District Court surmised that Limauro had incriminated Chandler in his pre-trial information reports to the Drug Enforcement Administration but had deleted that evidence from his testimony. The correctness of the assumption was not verified, but the Court cited the prosecution for failing to disclose any discrepancies that might have led to a weaker case against Chandler.

During the government's case, at the close of the government's case, and at the conclusion of all testimony, the appellees moved for dismissal. Each time the Court reserved its ruling. After the verdict was returned, however, the Court granted the motions, relying on its supervisory power to order dismissal when "the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction", *United States v. Russell*, 411 U.S. 423, 431, 93 S.Ct. 1637, 1643, 36 L.Ed.2d 366 (1973). *See also*

*McNabb v. United States*, 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. 819 (1943).

## THE DISTRICT COURT JUDGMENT

As to the more important aspects of it, Judge Fay's highly understandable judicial disapproval of tactics which he believed had occurred may be boiled down to the following:

1. [T]he prosecutor misrepresented the government's treatment of its principal witness, Rudy Limauro, and in so doing suppressed evidence. 386 F.Supp. at 1075.

2. Limauro's testimony on direct examination as to government promises to him was false and the government knew it was false but took no steps to amend or correct the answer. *Ibid.*

3. The government had access to documents from which it should have known that Limauro had been convicted of "more than twenty felonies", instead of six, but allowed his false testimony to stand. *Ibid.*

4. The prosecutors should have known of arrangements which must have been made for state immunity to Limauro and should have advised the Court in that regard. 386 F.Supp. at 1077.

5. Limauro had been given complete immunity, a blank check, by the government to participate as an accomplice in the jewelry store robbery and the murder of a policeman; nevertheless, the prosecution, knowing all this, continued to assure the Court that no promises of preferential treatment had been given Limauro. Under strict questioning by the Court, one of the prosecutors responded "Obviously no one was going to prosecute him. Obviously, no one was going to mention it. He was an important witness in a case involving narcotics." 386 F.Supp. at 1077.

Assuming that all this happened, the first concern is whether it was remedied in such a way as to eliminate any preju-

674

dice to the defendants' case. The significance of the jury being apprised of the facts before the case is submitted to it has twice been recognized by this Court, *United States v. Cawley*, 5 Cir. 1973, 481 F.2d 702; *United States v. Johnson*, 5 Cir. 1974, 487 F.2d 1318, *cert. denied*, 419 U.S. 825, 95 S.Ct. 41, 42 L.Ed.2d 48 (1974). *See also United States v. DeLeo*, 1 Cir. 1970, 422 F.2d 487, 498–99, *cert. denied*, 397 U.S. 1037, 90 S.Ct. 1355, 25 L.Ed.2d 648 (1970).

## THE DISPOSITION HERE

■ Taking them as they are recited in the opinion of the District Court, the tactics of government agents and prosecutors invited a swift and stern response. The question, however, is whether the response was correct. Carefully weighing the trial record, did the conduct require that the convictions be nullified? Should the action have been directed toward prosecutors and government agents rather than taking the form of a fortuitous escape for the convicted felons? Defendants are entitled to take advantage of any error which prejudices their case but they are not entitled to a reward for such conduct unless it could have had at least some impact on the verdict and thus redounded to their prejudice. See, *e. g., United States v. Dooling*, 2 Cir., 1969, 406 F.2d 192, *cert. denied*, 395 U.S. 911, 89 S.Ct. 1744, 23 L.Ed.2d 224 (1969).

■ The answer to these questions, as applicable to the case now before us, is to be found in the following considerations:

(1) Whatever the reluctance of the government to see its association with Limauro exposed, the exposure occurred; the jury heard the facts, developed by the skill and industry of defense counsel. This is not a case in which suppressed evidence failed to reach the jury. Assuming an effort at suppression, the effort signally failed. The defendants had the benefit of that failure, emphasized in blows which might have destroyed any hope of success. This was not a case in which false evidence, uncorrected, went to the jury.

(2) All of the evidence here in issue went directly to one subject, the credibility of a thoroughly blackened witness. It may be difficult to conceive of a person much worse than Limauro; yet the law did not bar him from the witness stand. The law left his credibility to the jury as the sole judge of it. Despite what it heard, the jury saw fit to convict.

(3) There was no plea of entrapment in this case. It was not contended that the black sheep led the others into the crime. The ultimate essence of their complaint is that they were brought to the penalties of the law by the testimony of one wholly unworthy of belief, that the government sought this result by unsuccessfully attempting to conceal the kind of character he really was. But the jury learned all about what kind of record he had, the uses to which the government had put him, and what he was getting out of it. Indeed, the jury was specifically told that the government had no intention of prosecuting him, a sweeping reward, a thrust into the vitals of his credibility.

(4) The appeal is not before us on the merits. That will no doubt follow the imposition of sentence, but appellees have not suggested here that the evidence was insufficient to support a conviction.

All of this leads to the conclusion that the tactics in issue had no prejudicial influence on the outcome of the case. If anything, those tactics, fully exposed to the jury, should have redounded to the benefit of the defense. The appellees have shown no reversible prejudice. On the contrary, they had the benefit of repeatedly catching the prosecution in highly embarrassing positions as to the credibility of its witness.

In sum, the case was fought out on *credibility* and, with all the essential facts before it, the jury decided that issue, however unfortunately for the defendants.

Hence, we need not indulge in dictum as to whether the law empowers a District Judge to dismiss an indictment, after a verdict of guilty, on account of governmental (prosecutorial) misconduct. We decline the government's invitation to do so and leave the point for the day when, and if, it arises in appropriate appellate form.

This opinion does not infer that District Courts may not deal appropriately with prosecutorial misconduct. They have ample power to do so. What we hold here is that the necessary facts came out, the defendants were not prejudiced by what took place and, therefore, due process does not require that they be given the "reward" of having the jury verdict set aside and the indictment dismissed.

Neither is this opinion to be construed as approving the practice of withholding disclosure with the purpose of disclosing it later or with the idea that it will "come out" later. We take this case as we find it and decide it accordingly.

The dismissal of the indictment is reversed. The case is remanded, with directions to reinstate the verdict.

Reversed and remanded, with directions.