UNITED STATES of America,
Plaintiff–Appellant,

v.

Jose Orlando LOPEZ, Defendant–
Appellee.

UNITED STATES of America,
Plaintiff–Appellant,

v.

Jose Orlando LOPEZ, Defendant–
Appellee.

Nos. 91–10274, 91–10393.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted May 12, 1992.

Decided March 17, 1993.

As Amended Sept. 22, 1993.

Motion to Strike, Correct or
Amend Denied Sept. 22, 1993.

**1456**

Joseph Douglas Wilson and F. Dennis Saylor, IV, U.S. Dept. of Justice, Washington, DC, for plaintiff-appellant.

William L. Osterhoudt, San Francisco, CA, for defendant-appellee.

Kevin M. Kelly, Las Vegas, NV, for amicus curiae Nevada Attys. for Crim. Justice.

Walter Barthold and Charles Stillman, New York City, for amicus curiae American College of Trial Lawyers.

Philip M. Brooks, Deputy State Public Defender, San Francisco, CA, for amicus curiae Office of the CA State Public Defender.

John T. Philipsborn, San Francisco, CA, for amicus curiae CA Attys. for Crim. Justice.

Before: FLETCHER, POOLE, and T. G. NELSON, Circuit Judges.

POOLE, Circuit Judge:

## I.

Jose Lopez was indicted for conspiracy to distribute and distribution of cocaine and heroin in violation of 21 U.S.C. §§ 846 and 841(a)(1), and for aiding and abetting in violation of 18 U.S.C. § 2. While awaiting trial, Lopez was detained with a codefendant, Antonio Escobedo, at the Federal Correctional Institution at Pleasanton.

Lopez retained attorney Barry Tarlow to represent him. Tarlow informed Lopez that he believed that the defendants had a viable entrapment defense and that, in any case, it was his general policy not to negotiate a plea with the government in exchange for cooperation.

Attorney James A. Twitty, who represented codefendant Escobedo, had agreed with Tarlow to coordinate a joint investigation on behalf of the defendants. In so doing, he often spoke to both Escobedo and Lopez by telephone and in person during visits to Pleasanton. In March or April of 1990, Escobedo telephoned Twitty and expressed his interest in reopening negotiations with the government. Concerned about his children, who he feared were being abused while in the custody of their mother, Lopez was anxious to be released from Pleasanton and thus echoed Escobedo's interest in a possible plea bargain.

Without informing Tarlow, Twitty twice traveled to Pleasanton in order to discuss the possibility of a plea bargain with Escobedo and Lopez. He spoke to both men about this possibility from five to nine times on the phone.

Lopez apparently did not want to retain another lawyer to negotiate with the government because he feared that doing so would cost him Tarlow's services, and Lopez wanted Tarlow to represent him in the event the case went to trial. Lopez also was concerned about the additional expense of having Tarlow conduct plea negotiations. Twitty accordingly contacted Lyons on behalf of both Lopez and Escobedo. Lyons claims that Twitty informed him that Lopez did not want Tarlow present at any meetings with the government because "Tarlow didn't represent his best interest in this particular context." Lyons avers that he did not press Twitty on this point, but instead assumed that Lopez was connected to a drug ring which was paying Tarlow's fees, and which would endanger his family if Tarlow learned about the negotiations with the government.

Twitty, however, maintains that during his first phone conversation with the prosecutor about the proposed negotiations, he emphasized that Lopez's reasons for excluding Tarlow had nothing to do with concerns about the safety of his family. He stressed that Tarlow's fees were not being paid by anyone with whom Lopez was in the drug business. According to Twitty, he informed the prosecutor that Lopez simply feared that if Tarlow knew about the plea negotiations, he would resign as Lopez's lawyer.

Recognizing the sensitivity of a meeting with Lopez without Tarlow's knowledge or consent, Lyons contacted the district court *ex parte*. The court referred the matter to a magistrate judge, who conducted an *in camera* interview of Lopez on May 21, 1990. The magistrate judge warned Lopez of the dangers of self-representation, informed him that he could have other counsel, and cautioned him that Twitty, as Escobedo's lawyer, could not represent him. Lopez insisted on going forward with the meeting, and signed a waiver prepared by the government. Lopez, along with Escobedo and his attorney Twitty, met with Lyons in the prosecutor's office.

On May 30, 1991, Lopez was taken once again before the magistrate judge, who verified that Lopez wanted to meet with the government a second time without Tarlow. The second meeting also took place in Lyons'

office, and was again attended by Lyons, Lopez, Escobedo, and Twitty. Following this second meeting, Lyons sent Twitty a proposed plea agreement for Escobedo, a copy of which Twitty provided to Lopez. After talking with Twitty, the two men rejected the proposal.

Tarlow found out about his client's discussions with the government indirectly. In August 1990, Lyons talked with Harold Rosenthal, who was the attorney for a third codefendant. Lyons alerted Rosenthal to the fact that the government had been negotiating with Lopez without Tarlow's knowledge. Rosenthal contacted Twitty, who urged him to refrain from informing Tarlow for fear that doing so would "mess up the deal." Nevertheless, Rosenthal called Tarlow. On August 15, 1990, Tarlow was permitted by the district court to withdraw as Lopez's counsel.

Having retained substitute counsel, Lopez filed a motion to dismiss the indictment on September 27, 1990. Lopez alleged that the government infringed upon his Sixth Amendment rights as well as Rules of Professional Conduct of the State Bar of California Rule 2–100 (1988). Binding pursuant to Local Rule 110–3 in the Northern District of California, Rule 2–100 generally prohibits a lawyer from communicating with another party in the case without the consent of that party's lawyer.

After extensive briefing and six hearings at which Twitty, Lopez, and Lyons testified, the district court concluded that Lyons had violated Rule 2–100. *United States v. Lopez*, 765 F.Supp. 1433, 1456 (N.D.Cal.1991). The court rebuffed the government's attempts to invoke the "Thornburgh Memorandum," a Justice Department policy statement which purports to exempt federal litigators from compliance with the rule against communicating with represented individuals without the consent of their lawyers. *Id.* at 1445–50; *see* Memorandum from Dick Thornburgh, Attorney General, to All Justice Department Litigators (June 8, 1989). The court also determined that Lyons had not insulated himself from blame by obtaining the approval of the district court before each meeting, since he had "effectively misled" the court

regarding Lopez's reasons for requesting to speak with him. *Id.* at 1452.

Since Lopez had been able to obtain competent replacement counsel for Tarlow, the court declined to say that the government's misconduct rose to the level of a Sixth Amendment violation. *Id.* at 1456. It also found, however, that Lopez had been significantly prejudiced, since he was effectively deprived of the counsel of his choice. *Id.* at 1461. Refusing to evaluate Lyons's actions apart from the Thornburgh memorandum which he invoked in his defense, the court condemned both as an egregious and flagrant "frontal assault on the legitimate powers of the court." *Id.* Rejecting less drastic remedies as ineffective, the district court invoked its supervisory powers in order to dismiss the indictment against Jose Lopez. *Id.* at 1464.

The government, on appeal, has prudently dropped its dependence on the Thornburgh Memorandum in justifying AUSA Lyons' conduct, and has thereby spared us the need of reiterating the district court's trenchant analysis of the inefficacy of the Attorney General's policy statement. *See* 765 F.Supp. at 1445–1450. The government instead argues that Rule 2–100 was not intended to apply to prosecutors pursuing investigations, that the contact with Lopez was authorized by law, that Rule 2–100 did not apply since Lopez was exercising his constitutional right of self-representation, and that Lopez waived his rights under Rule 2–100. Finally, the government contends that dismissal of the indictment was improper, even if Lyons did violate the ethical rule.

## II.

█ We review *de novo* the district court's conclusion that specific conduct violated court rules. *In re Dresser Indus. Inc.,* 972 F.2d 540, 543 (5th Cir.1992); *cf. Golden Eagle Dist. Corp. v. Burroughs Corp.,* 801 F.2d 1531, 1538 (9th Cir.1986) (district court's imposition of sanctions for violation of Rule 11 reviewed for abuse of discretion). The court's findings of fact, however, are reviewed for clear error. *United States v. Barrera–Moreno,* 951 F.2d 1089, 1091 (9th Cir.1991), *cert. denied,* —— U.S. ——, 113 S.Ct. 417, 121 L.Ed.2d 340 (1992).

Rule 110–3 of the local rules of the Northern District of California requires that:

Every member of the bar of this court and any attorney permitted to practice in this court under Local Rule 110–2 shall be familiar with and comply with the standards of professional conduct required of members of the State Bar of California and contained in the State Bar Act, the Rules of Professional Conduct of the State Bar of California, and decisions of any court applicable thereto; maintain the respect due courts of justice and judicial officers; [and] perform with the honesty, care, and decorum required for the fair and efficient administration of justice.

Rule 2–100 of the Rules of Professional Conduct of the State Bar of California governs communications with a represented party:

(A) While representing a client, a member shall not communicate directly or indirectly about the subject of the representation with a party the member knows to be represented by another lawyer in the matter, unless the member has the consent of the other lawyer.

. . . .

(C) This rule shall not prohibit:

(1) Communications with a public officer, board, committee, or body;

(2) Communications initiated by a party seeking advice or representation from an independent lawyer of the party's choice; or

(3) Communications otherwise authorized by law.

Rule 2–100's prohibition against communicating with represented parties without the consent of their counsel is both widely accepted and of venerable heritage. The California rule tracks the language of Rule 4.2 of the American Bar Association's Model Rules of Professional Conduct, which in turn is nearly identical to its predecessor in the Model Code of Professional Responsibility, Disciplinary Rule 7–104(A)(1). A similar prohibition appears under Canon 9 of the ABA's Canons of Professional Ethics, which were promulgated in 1908. Not simply an Ameri-

can invention, the prohibition has roots which can be traced back to English common law. *See, e.g., In Re Oliver*, 2 Adm. & Eccl. 620, 622, 111 Eng.Rep. 239, 240 (1835) ("When it appeared that Mrs. Oliver had an attorney, to whom she referred, it was improper to obtain her signature, with no attorney present on her part. If this were permitted, a very impure, and often a fraudulent, practice would prevail.") (Lord Denman, C.J.). Today some version of the rule is in effect in all fifty American states.

The rule against communicating with a represented party without the consent of that party's counsel shields a party's substantive interests against encroachment by opposing counsel and safeguards the relationship between the party and her attorney. As Tarlow's withdrawal upon discovering the secret communication between Lopez and the government exemplifies all too well, the trust necessary for a successful attorney-client relationship is eviscerated when the client is lured into clandestine meetings with the lawyer for the opposition. As a result, uncurbed communications with represented parties could have deleterious effects well beyond the context of the individual case, for our adversary system is premised upon functional lawyer-client relationships.

## A.

■ The government argues, however, that Rule 2–100 was not intended to apply to prosecutors pursuing criminal investigations.

Decisions of the state courts of California, which are binding on attorneys practicing in the Northern District of California through Local Rule 110–3, however, have held prosecutors to the rules prohibiting communications with represented parties. In *People v. Sharp*, 150 Cal.App.3d 13, 197 Cal.Rptr. 436 (1983), decided under the predecessor of Rule 2–100, the court noted that:

> [b]ecause the prosecutor's position is unique—he represents authority and the discretion to make decisions affecting the defendant's pending case—his contact carries an implication of leniency for cooperative defendants or harsher treatment for the uncooperative. Such contact intrudes upon the function of defense counsel and impedes his or her ability to negotiate a settlement and properly represent the client, whose interests the rule is designed to protect.

*Id.* 197 Cal.Rptr. at 439–40. The court thus concluded that, by directing police agents to conduct a lineup without notifying the defendant's attorney, the prosecutor violated his professional ethical responsibilities. *Id.* at 440; *see also People v. Manson*, 61 Cal. App.3d 102, 132 Cal.Rptr. 265, 301 (1976) (holding prosecutor to ethical rules because he "is no less a member of the State Bar than any other admitted lawyer"), *cert. denied*, 430 U.S. 986, 97 S.Ct. 1686, 52 L.Ed.2d 382 (1977); *see also Triple A Mach. Shop, Inc. v. State*, 213 Cal.App.3d 131, 261 Cal. Rptr. 493, 499 (1989) (assuming Rule 2–100 can apply to prosecutors).[1]

---

1. The government has speculated for the first time on appeal that the California Rules of Professional Conduct were not validly adopted by the Northern District of California, and that Local Rule 110–3 as adopted predates California's adoption of Rule 2–100. The government concedes that they failed to raise this issue before the district court, but argues that we may dispense with the rule that the issue is waived because it is a purely legal issue. We decline to do so, however, for the government's argument rests on the claim that the Northern District has not specifically adopted Rule 2–100, and that Local Rule 110–3 was adopted without proper notice and comment. Both of these claims are factual in nature, and we decline to review them without the proper development of a record. *See Consolidated Marketing, Inc. v. Marvin Properties, Inc.*, 854 F.2d 1183, 1187 (9th Cir.1988). In any event, we have previously upheld the Northern District's adoption of the California Rules of Pro-

fessional Conduct, and rejected the argument that attorneys practicing in the Northern District are not subject to the ABA Model Code because the district's rules did not specifically adopt the code. *Paul E. Iacono Structural Eng'r, Inc. v. Humphrey*, 722 F.2d 435, 438–39 (9th Cir.), *cert. denied*, 464 U.S. 851, 104 S.Ct. 162, 78 L.Ed.2d 148 (1983). Moreover, Rule 7–103 of the California Rules of Professional Conduct, which was in effect prior to the adoption of Rule 2–100, also prohibited communications with represented parties in almost identical terms.

The government has called our attention to *Baylson v. Disciplinary Bd.*, 975 F.2d 102 (3d Cir.1992), which held that it was beyond the rule-making authority of the district court to adopt a state disciplinary rule governing the ability of federal prosecutors to obtain a grand jury subpoena. *Id.* at 111. The Third Circuit's decision was founded on the fact that the rule in

The cases advanced by the government in support of its position are largely irrelative. Starting with *United States v. Lemonakis,* 485 F.2d 941 (D.C.Cir.1973), *cert. denied,* 415 U.S. 989, 94 S.Ct. 1587, 39 L.Ed.2d 885 (1974), a number of courts have held that there is no breach of a prosecutor's ethical duty to refrain from communication with represented parties when investigating officers question or contact suspects prior to their indictment. *See, e.g., id.* at 956; *United States v. Kenny,* 645 F.2d 1323, 1339 (9th Cir.), *cert. denied,* 452 U.S. 920, 101 S.Ct. 3059, 69 L.Ed.2d 425 (1981), *and cert. denied,* 454 U.S. 828, 102 S.Ct. 121, 70 L.Ed.2d 104 (1981); *United States v. Ryans,* 903 F.2d 731, 740 (10th Cir.) *cert. denied,* 498 U.S. 855, 111 S.Ct. 152, 112 L.Ed.2d 118 (1990); *United States v. Sutton,* 801 F.2d 1346, 1366 (D.C.Cir.1986). Such cases have reasoned that criminal suspects should not be permitted to insulate themselves from investigation simply by retaining counsel. *See, e.g., United States v. Jamil,* 707 F.2d 638, 646 (2d Cir.1983); *United States v. Hammad,* 858 F.2d 834, 839 (2d Cir.1988); *see also* Pamela S. Karlan, *Discrete and Relational Criminal Representation: The Changing Vision of the Right to Counsel,* 105 Harv.L.Rev. 670, 701 (1992) ("A broad interpretation of the no-contact rule would provide a powerful incentive for criminal actors to seek relational representation because having an ongoing relationship with an attorney could insulate them from several of the most effective law enforcement techniques for investigating complex crime."). In addition, they have noted that during investigation of the case and prior to indictment,

> the contours of the "subject matter of the representation" by [the suspect's] attorneys, concerning which the code bars "communication," [are] less certain and thus even less susceptible to the damage of "artful" legal questions the Code provisions appear designed in part to avoid.

*Lemonakis,* 485 F.2d at 956; *compare* Rule 2–100 (barring communication "about the subject of the representation").[2]

The government's insistence that there are no salient differences between the pre- and post-indictment contexts for purposes of Rule 2–100 is puzzling. The prosecutor's ethical duty to refrain from contacting represented defendants entifies upon indictment for the same reasons that the Sixth Amendment right to counsel attaches:

> The initiation of judicial criminal proceedings is far from a mere formalism. It is the starting point of our whole system of adversary criminal justice. For it is only then that the government has committed itself to prosecute, and only then that the adverse positions of government and defendant have solidified.

*Kirby v. Illinois,* 406 U.S. 682, 689, 92 S.Ct. 1877, 1882, 32 L.Ed.2d 411 (1972) (plurality opinion). In addition to focusing "the subject of the representation," indictment gives rise to a defendant's "right to rely upon counsel as a 'medium' between him and the State." *Maine v. Moulton,* 474 U.S. 159, 176, 106 S.Ct. 477, 487, 88 L.Ed.2d 481 (1985). Thus,

---

question was inconsistent with Fed.R.Crim.P. 17. *See* Fed.R.Crim.P. 57 (district court may adopt rules "not inconsistent with" the Federal Rules of Criminal Procedure). At the same time, the Third Circuit recognized that "[a]mong the rules which fall under the local rule-making authority of the district courts are rules regulating the conduct of attorneys practicing before them." 975 F.2d at 107. *Baylson* is thus not in conflict with our holding that Rule 2–100 is applicable via Local Rule 110–3, since requiring prosecutors to refrain from communicating with represented defendants is not only consistent with the rules of criminal procedure, but implied by them. *See* Fed.R.Crim.P. 11(e)(1) (plea negotiations may be conducted between attorney for the government and attorney for the defendant).

**2.** Although we do not reach the issue, we note that courts have been divided over whether the rule applies even in a pre-indictment setting. Three circuits have held that in *custodial* situations, the ethical rule prohibits prosecutors from interviewing defendants in the absence of and without the consent of their counsel: *United States v. Thomas,* 474 F.2d 110, 112 (10th Cir.), *cert. denied,* 412 U.S. 932, 93 S.Ct. 2758, 37 L.Ed.2d 160 (1973), *United States v. Killian,* 639 F.2d 206, 210 (5th Cir.), *cert. denied,* 451 U.S. 1021, 101 S.Ct. 3014, 69 L.Ed.2d 394 (1981), and *United States v. Durham,* 475 F.2d 208, 211 (7th Cir.1973). *See also United States v. Hammad,* 858 F.2d 834, 839 (2d Cir.1988) (refusing to "bind[ ] the Code's applicability to the moment of indictment" since "an indictment's return lies substantially within the control of the prosecutor").

the Sixth Amendment guarantee would be rendered fustian if one of its "critical components," a lawyer-client " 'relationship characterized by trust and confidence,' " could be circumvented by the prosecutor under the guise of pursuing the criminal investigation. *United States v. Chavez,* 902 F.2d 259, 266 (4th Cir.1990) (quoting *Morris v. Slappy,* 461 U.S. 1, 21, 103 S.Ct. 1610, 1621, 75 L.Ed.2d 610 (1983) (Brennan, J., concurring)); *see also Patterson v. Illinois,* 487 U.S. 285, 290 n. 3, 108 S.Ct. 2389, 2393 n. 3, 101 L.Ed.2d 261 (1988) ("Once an accused has a lawyer, a distinct set of constitutional safeguards aimed at preserving the sanctity of the attorney-client relationship takes effect."). Thus, beginning at the latest upon the moment of indictment, a prosecuting attorney has a duty under ethical rules like Rule 2–100 to refrain from communicating with represented defendants.

### B.

The government next adopts the position that Lyons' conduct falls within the "communications otherwise authorized by law" exception to the rule against attorney communication with represented parties. *See* Rule 2–100(C)(3). The government argues that Lyons' contact with Lopez was authorized by statutes enabling prosecutors to conduct criminal investigations, and that the meetings were authorized by the magistrate judge's approval.

### 1.

■ The government reasons that federal prosecutors operate pursuant to a "statutory scheme" that permits them to communicate with represented parties in order to detect and prosecute federal offenses. Citing 28 U.S.C. §§ 509, 515(a) and (c), 516, 533 and 547, the government argues that Justice Department attorneys fall within the "authorized by law" exception to California Rule 2–100 and its counterparts.

The comment to California Rule 2–100 notes that:

> Rule 2–100 is intended to control communications between a member [of the bar] and persons the member knows to be represented by counsel unless a statutory

scheme or case law will override the rule. There are a number of *express statutory schemes* which authorize communications between a member and person who would otherwise be subject to this rule. . . . *Other applicable law also includes the authority of government prosecutors and investigators to conduct criminal investigations, as limited by the relevant decisional law.*

(Emphasis supplied). Thus, the "authorized by law" exception to Rule 2–100 requires that a statutory scheme expressly permit contact between an attorney and a represented party. While recognizing the statutory authority of prosecutors to investigate crime, however, Rule 2–100 is intended to allow no more contact between prosecutors and represented defendants than the case law permits. We agree with the district court that the statutes cited by the government are nothing more than general enabling statutes. Nothing in these provisions expressly or impliedly authorizes contact with represented individuals beyond that permitted by case law. As discussed above, "the authority of government prosecutors and investigators to conduct criminal investigations" is "limited by the relevant decisional law" to contacts conducted prior to indictment in a non-custodial setting. Lyons' discussions with Lopez were not so authorized.

### 2.

■ The government also maintains that by obtaining the prior approval of a magistrate judge, Lyons brought his conversations with Lopez within the realm of the "authorized by law" exception to California Rule 2–100. We agree that in an appropriate case, contact with a represented party could be excepted from the prohibition of Rule 2–100 by court order. *See* Rule 2–100 cmt. (Rule 2–100 forbids communication with represented persons "unless . . . case law will override the rule."). But, as in other areas of the law, judicial approval cannot absolve the government from responsibility for wrongful acts when the government has misled the court in obtaining its sanction. *See United States v. Leon,* 468 U.S. 897, 914, 104 S.Ct. 3405, 3416, 82 L.Ed.2d 677 (1984) ("[T]he deference accorded to a magistrate's finding of probable

cause does not preclude inquiry into the knowing or reckless falsity of the affidavit on which the determination was based."); *Franks v. Delaware*, 438 U.S. 154, 165, 98 S.Ct. 2674, 2681, 57 L.Ed.2d 667 (1978) (warrant affidavit must be truthful "so as to allow the magistrate to make an independent evaluation of the matter"). When seeking the authorization of the district court, the prosecutor had an affirmative duty to avoid misleading the court. Rules of Professional Conduct of the State Bar of California Rule 5–200(B) (1988) ("In presenting a matter to a tribunal, a member . . . [s]hall not seek to mislead the judge, judicial officer or jury by an artifice or false statement of fact or law.").

The district court concluded that the magistrate judge approved the meeting between Lyons and Lopez in the mistaken belief, fostered by Lyons, that:

> Tarlow[ ] was being paid by a third party with interests inimical to those of Lopez and that Lopez feared that if Tarlow became aware of his client's interest in cooperating with the government, he would pass the information on to others who would harm Lopez and/or his family.

765 F.Supp. at 1452. The district court thus concluded that the magistrate judge's approval could not legally authorize Lyons to meet with Lopez.

The district court found that Lyons materially misled the magistrate judge regarding the facts surrounding Lopez's request to speak directly with the prosecutor. We agree that the magistrate judge apparently did not have a full understanding of the facts surrounding Lopez's request. Without that understanding, she could not have made an informed decision to authorize the communications.

Although it is not necessary to our determination in this case to decide whether the district court erred in its finding that Lyons materially misled the magistrate judge, we suggest that the finding is not sustainable without resolving certain conflicts in the testimony of Twitty, Lyons, and Lopez as to what Lyons knew and when he knew it (the district court, for whatever reason, said it was not necessary to resolve these conflicts). On remand, were the district court to consider lesser sanctions than dismissal of the indictment, resolution of these conflicts would be essential.

### C.

■ The government makes several related arguments regarding the effect of Lopez's waiver on its ethical obligations. We note initially that it would be a mistake to speak in terms of a party "waiving" her "rights" under Rule 2–100. The rule against communicating with represented parties is fundamentally concerned with the *duties* of attorneys, not with the *rights* of parties. Lyons' duties as an attorney practicing in the Northern District of California extended beyond his obligation to respect Lopez's rights. Consequently, as the government concedes, ethical obligations are personal, and may not be vicariously waived.

The government also argues, however, that Lopez created a form of "hybrid representation" by waiving his right to counsel for the limited purpose of negotiating with the government, while retaining Tarlow as his counsel for all other purposes. Since Lopez would be unrepresented for purposes of discussions with the government, it would presumably not be a violation of Rule 2–100 for the government to communicate with him directly. We have in the past held, however, that "[i]f the defendant assumes any of the 'core functions' of the lawyer, . . . the hybrid scheme is acceptable only if the defendant has voluntarily waived counsel." *United States v. Turnbull*, 888 F.2d 636, 638 (9th Cir.1989) (quoting *United States v. Kimmel*, 672 F.2d 720, 721 (9th Cir.1982)), *cert. denied*, 498 U.S. 825, 111 S.Ct. 78, 112 L.Ed.2d 51 (1990). Representing a client in negotiations with the government is certainly one of the core functions of defense counsel, and there is no question that Lopez did *not* waive his right to counsel. In fact, the magistrate judge, following the hearing with Lopez, clearly communicated to Lyons that while Lopez was waiving his right to have counsel present while inquiring about the possibility of cooperating with the government, he was not waiving his right to counsel. The district court found Lopez did not wish to waive his

right to have an attorney present. In *Kimmel*, we explained that:

> [w]hen the accused assumes functions that are at the core of the lawyer's traditional role ... he will often undermine his own defense. Because he has a constitutional right to have his lawyer perform core functions, he must knowingly and intelligently waive that right.

672 F.2d at 721. While we are not immediately concerned with the constitutional dimensions of Lopez's communications with the government, it is clear that the magistrate judge's intervention could not, as a matter of law, have created a form of "hybrid representation." To the contrary, Lyons was notified by the court that Lopez was still represented by Tarlow, and consequently he could not evade his duty under Rule 2–100 on this basis.

For the same reason, we reject the government's claim that enforcing the ethical prohibition against communication with represented parties would interfere, under these circumstances, with the party's constitutional rights. The government relies on the doctrine established in *Faretta v. California*, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975), that it is unconstitutional to require a criminal defendant to be represented by an attorney. We see no conflict between *Faretta* and Rule 2–100. Of course, Rule 2–100 does not bar communications with persons who have waived their right to counsel, for by its express terms the rule only applies to "communications with a *represented* party." (Emphasis supplied). Because Lopez did not waive his right to counsel, *Faretta* is immaterial.

### D.

We therefore conclude that the district court was correct in holding that Lyons had an ethical duty to avoid communicating directly with Lopez regarding the criminal prosecution so long as Lopez was represented by Tarlow.

### III.

■ The district court dismissed the indictment under its inherent supervisory powers. Finding the government's conduct "flagrant and egregious," and believing that Lopez had been prejudiced through loss of his attorney of choice, the district court reasoned that no lesser sanction could adequately preserve judicial integrity and deter future governmental misconduct. 765 F.Supp. at 1461–64. We review the district court's exercise of its supervisory powers for an abuse of discretion. *Barrera–Moreno*, 951 F.2d at 1091.

■ There are three legitimate grounds for a court's exercise of supervisory power: "to implement a remedy for the violation of a recognized statutory or constitutional right; to preserve judicial integrity by ensuring that a conviction rests on appropriate considerations validly before a jury; and to deter future illegal conduct." *United States v. Simpson*, 927 F.2d 1088, 1090 (9th Cir.1991). We have recognized that exercise of supervisory powers is an appropriate means of policing ethical misconduct by prosecutors. *United States v. McClintock*, 748 F.2d 1278, 1285–86 (9th Cir.1984), *cert. denied*, 474 U.S. 822, 106 S.Ct. 75, 88 L.Ed.2d 61 (1985); *see also United States v. Williams*, — U.S. —, —, 112 S.Ct. 1735, 1742, 118 L.Ed.2d 352 (1992) ("[T]he court's supervisory power ... may be used as a means of establishing standards of prosecutorial conduct before the courts themselves."). We also have expressly recognized the authority of the district court to dismiss actions where government attorneys have "willfully deceived the court," thereby interfering with "the orderly administration of justice." *United States v. National Medical Enters., Inc.*, 792 F.2d 906, 912 (9th Cir.1986) (quotations omitted).

■ It was therefore within the discretion of the district court to act in an appropriate manner to discipline Lyons if he subverted of the attorney-client relationship. We have no doubt but that federal courts are empowered to deal with such threats to the integrity of the judicial process. In the words of the Supreme Court, "[f]ederal courts have an independent interest in ensuring that criminal trials are conducted within the ethical standards of the profession and that legal proceedings appear fair to all who observe them." *Wheat v. United States*, 486 U.S.

153, 160, 108 S.Ct. 1692, 1697–98, 100 L.Ed.2d 140 (1988).

 At the same time, however, even assuming that Lyons did act unethically, we question the prudence of remedying that misconduct through dismissal of a valid indictment. To justify such an extreme remedy, the government's conduct must have caused substantial prejudice to the defendant and been flagrant in its disregard for the limits of appropriate professional conduct. *Barrera–Moreno,* 951 F.2d at 1093.

In *United States v. Owen,* 580 F.2d 365 (9th Cir.1978), we adopted the view that, in order to justify dismissal of the indictment under the court's supervisory powers, there must "be some prejudice to the accused by virtue of the alleged acts of misconduct." *Id.* at 367. We explained that the idea of prejudice entails that the government's conduct "had at least some impact on the verdict and thus redounded to [the defendant's] prejudice." *Id.* at 368 (quoting *United States v. Acosta,* 526 F.2d 670, 674 (5th Cir.), *cert. denied,* 426 U.S. 920, 96 S.Ct. 2625, 49 L.Ed.2d 373 (1976)); *see also United States v. Larrazolo,* 869 F.2d 1354, 1358 (9th Cir. 1989) ("a defendant must be *actually* prejudiced in order for the court to invoke its supervisory powers to dismiss an indictment for prosecutorial misconduct." (emphasis added)). Thus, in · *Owen,* we found no grounds for dismissal where the defendant could not show any effect from the government's actions "beyond the· vague claim of a strain in his relationship with" his attorney. 580 F.2d at 368.

The district court specifically found that the attorney Lopez found to replace Tarlow following his withdrawal "is very able and will provide him with outstanding representation." 765 F.Supp. at 1456. Without in any way wishing to disparage the importance of a criminal defendant's choice of counsel, we fail to see how Tarlow's withdrawal in these circumstances could be said to have substantially prejudiced Lopez in his defense.

 Consequently, even if the district court's finding that Lyons misled the court is correct, we conclude that the district court abused its discretion in dismissing the indict-ment. We are sensitive to the district court's concerns that none of the alternative sanctions available to it are as certain to impress the government with our resoluteness in holding prosecutors to the ethical standards which regulate the legal profession as a whole. *See* 765 F.2d at 1461–64. At the same time, we are confident that, when there is no showing of substantial prejudice to the defendant, lesser sanctions, such as holding the prosecutor in contempt or referral to the state bar for disciplinary proceedings, can be adequate to discipline and punish government attorneys who attempt to circumvent the standards of their profession.

Accordingly, the order dismissing the indictment is VACATED. The case is RE-MANDED for proceedings consistent with this opinion.

FLETCHER, Circuit Judge, with whom Circuit Judge T.G. NELSON, joins, concurring:

At issue in this case is the conduct of the government. Because it does not seem to me that the story began or ended with the prosecutor's misbehavior, I feel compelled to say a few words about the actions of Mr. Tarlow, Mr. Twitty, and the. magistrate judge.

Tarlow told Lopez at the outset of the representation that it was his "general policy" not to represent clients in plea negotiations that contemplate cooperation with the government. *United States v. Lopez,* 765 F.Supp. 1433, 1438–39 (N.D.Cal.1991). In a declaration submitted to the district court, Tarlow elaborated that he considers such negotiations "personally morally and ethically offensive," and that, while he would have conveyed an offer of cooperation to Lopez, "another attorney would be willing and better able to arrange his informant activities." *Id.* at 1440 n. 12. Although Tarlow apparently did not say so explicitly, Lopez took Tarlow's policy statement to mean that if Lopez wanted to negotiate, Tarlow would withdraw from representing him altogether. *See id.* at 1439–40.

Concerned about the welfare of his children because he thought his wife might not be caring for them properly, Lopez decided

that he wanted to explore the possibility of an earlier release by cooperating with the government. · Lopez also wanted Tarlow to try the case if it went to trial. Faced with a difficult dilemma that he may not have anticipated when he retained Tarlow as counsel, Lopez decided to meet with the government unrepresented. I question whether Tarlow's "general policy" was in the best interests of his clients generally, and Lopez's specifically.

A criminal attorney who is bound by the Rules of Professional Conduct of the State Bar of California ("California Rules") and California's standards of professional conduct, as was Tarlow by virtue of the Northern District's Local Rule 110–3, is not free to terminate his or her representation of a client at will, or for mere personal considerations, or without the permission of the court. *People v. Castillo,* 233 Cal.App.3d 36, 284 Cal.Rptr. 382, 392 (1991), *review denied,* 1991 Cal. LEXIS 5144 (Cal. Nov. 14, 1991) (citing *People v. Murphy,* 35 Cal.App.3d 905, 111 Cal.Rptr. 295, 304 (1974)); *see also* N.D.Cal. Local Rule 110–3 (attorneys practicing in Northern District must comply with "the standards of professional conduct required of members of the State Bar of California and contained in the State Bar Act, the Rules of Professional Conduct of the State Bar of California, and decisions of any court applicable thereto"). Notably, although under the ABA Model Rules of Professional Conduct ("ABA Model Rules") an attorney may withdraw from representation if the client "insists upon pursuing an objective that the lawyer considers repugnant or imprudent," no comparable provision appears in the California Rules. *Compare* ABA Model Rule 1.16(b)(3) *with* Cal. Rule 3–700(C). *See also Morris v. Slappy,* 461 U.S. 1, 24 n. 6, 103 S.Ct. 1610, 1623 n. 6, 75 L.Ed.2d 610 (1983) (Brennan, J., concurring) (noting that continuous representation of a criminal defendant throughout trial court proceedings " 'affords the best opportunity for the development of a close and confidential attorney-client relationship' ") (quoting ABA Standards for Criminal Justice); Harold S. Lewis, Jr., *Commentary: Shaffer's Suffering Client, Freedman's Suffering Lawyer,* 38 Cath.U.L.Rev. 129, 133 n. 13 (criticizing Model Rule 1.16(b)(3) for allowing an attorney to withdraw for reasons of conscience because it "unfairly disappoints the client's reasonable expectations.") Because moral repugnance is not listed in the California Rules as a ground for permissive withdrawal, and because a criminal defense lawyer may not be entitled to assert moral repugnance to plea bargaining in any event, it is not certain, were a court to consider the matter, that Tarlow's general policy would prevail over a client's wish to pursue preliminary plea discussions with the government. *See* John W. Hall, Jr., *Professional Responsibility of the Criminal Lawyer* § 14.2, at 472 (1987) ("If the nature of the case warrants it, defense counsel should explore plea discussions with the prosecutor."); *cf. Mason v. Balcom,* 531 F.2d 717 (5th Cir.1976) (ineffective assistance in part due to counsel's failure to plea bargain when his client may have benefitted); *People v. Frierson,* 39 Cal.3d 803, 218 Cal. Rptr. 73, 78–79, 705 P.2d 396, 401–03 (1985) (listing fundamental decisions over which the defendant, rather than his or her counsel, retains ultimate control; "the decision whether to plead guilty to a lesser offense ... frequently reflects strategic concerns, but a defendant nonetheless retains personal control over such a plea."); Cal. Rule 3–510(A)(1) ("A member [of the state bar] shall promptly communicate ... [a]ll terms and conditions of any offer made to the client in a criminal matter."); ABA Model Rule 1.4 comment ("A lawyer who receives ... a proffered plea bargain in a criminal case should promptly inform the client of its substance unless prior discussions with the client have left it clear that the proposal will be unacceptable.")

Ideally, sufficient candor and trust are present in an attorney-client relationship such that a defendant does not feel compelled to resort to clandestine meetings with the government. Indeed, the model of a successful attorney-client relationship, as expounded in *Strickland v. Washington,* is one in which "[c]ounsel's actions are ... based ... on informed strategic choices made by the defendant and on information supplied by the defendant." 466 U.S. 668, 691, 104 S.Ct. 2052, 2066, 80 L.Ed.2d 674 (1984); *see also Campbell v. Kincheloe,* 829 F.2d 1453, 1463

(9th Cir.1987) ("The client's wishes are not to be ignored entirely."), *cert. denied,* 488 U.S. 948, 109 S.Ct. 380, 102 L.Ed.2d 369 (1988). Tarlow's relationship with Lopez fell far short of the ideal.

As for Twitty, counsel for codefendant Escobedo, his conduct was, undeniably, less than exemplary. Twitty had access to Lopez at Pleasanton correctional facility, where Escobedo was also incarcerated, because Twitty was responsible for what may have been an ill-conceived "joint investigation" of the two defendants' cases. In view of Lopez's problem with Tarlow, Twitty may have intervened in Lopez's affairs with benign intentions, but ultimately he ended up representing two defendants who had potentially conflicting interests. Although he informed Lopez that he could not act as his lawyer, Twitty nonetheless apparently advised both Lopez and Escobedo during the first meeting with the government, and may have pressured Lopez to provide information to the prosecutor during the second. 765 F.Supp. at 1442–43.

The Sixth Amendment contemplates that the assistance of counsel be "untrammeled and unimpaired by ... requiring that one lawyer should simultaneously represent conflicting interests." *Glasser v. United States,* 315 U.S. 60, 70, 62 S.Ct. 457, 465, 86 L.Ed. 680 (1942); *see also.* Cal.Rule 3–310(B) ("A member [of the state bar] shall not concurrently represent clients whose interests conflict, except with their informed written consent."); ABA Model Rule 1.7(b) ("A lawyer shall not represent a client if the representation of that client may be materially limited by the lawyers' responsibilities to another client ... unless ... the lawyer reasonably believes the representation will not be adversely affected[ ] and ... the client consents after consultation.") When an attorney represents defendants with conflicting interests, "the evil ... is in what the advocate finds himself compelled to *refrain* from doing, not only at trial but also as to possible pretrial plea negotiations.... [T]o assess the impact of a conflict of interest on the attorney's options, tactics, and decisions in plea negotiations would be virtually impossible." *Holloway v. Arkansas,* 435 U.S. 475, 490–91, 98 S.Ct. 1173, 1181–82, 55 L.Ed.2d 426 (1978).

Significantly, the government had apparently taken the position that a plea agreement would be possible only in the event that both Lopez and Escobedo agreed to cooperate. *Id.* at 1439. Assuming he felt that such cooperation was in his own best interest, Escobedo thus had an incentive to pressure Lopez to cooperate as well. Under these circumstances, Twitty was the wrong person to be acting on Lopez's behalf during plea discussions with the government.

Finally, there are the actions of the magistrate judge to consider. Although at the hearing before the magistrate the prosecutor apparently did not say anything about his suspicion regarding the source of payment for Tarlow's fees, the district court found that the magistrate "was operating under the mistaken assumption" that Tarlow was "being paid by a third party with interests inimical to those of Lopez." 765 F.2d at 1452. Because the prosecutor had previously communicated such a theory to the presiding district judge and because he failed to disabuse the magistrate of her erroneous assumption, the district court found that the government "effectively misled" the magistrate. The district court further found that the magistrate did not ask Lopez certain critical questions when he appeared before her, namely, whether Tarlow's fees were in fact being paid by someone with a conflicting interest, or whether Lopez feared for his or his family's safety should Tarlow learn of the pending plea negotiations. *Id.* at 1442 n. 13, 1452 n. 38.

The magistrate was confronted with a difficult situation. Unfortunately, her decision to allow Lopez to meet with the government ultimately led to Lopez's losing Tarlow as his counsel, the very result Lopez had sought to avoid. Although, as the district court found, her actions may have been "understandable" in view of her assumption that Tarlow was being paid by an interested third party, *id.* at 1452, her judgment may have benefitted from a more thorough questioning of Lopez regarding the fee arrangement with Tarlow. Some different options might have presented themselves had she been convinced that the safety of Lopez and his family were not at stake.

In this era of guideline sentencing, when the applicable guideline often assumes more importance than the crime of conviction, it is not unreasonable that a defendant would want to find out what the government might offer. Various forces conspired to render that inquiry exceedingly difficult for Lopez. Contrary to the intent of the Sixth Amendment, he was left to face the "'prosecutorial forces of organized society'" alone. *Moran v. Burbine,* 475 U.S. 412, 430, 106 S.Ct. 1135, 1146, 89 L.Ed.2d 410 (1986) (quoting *Maine v. Moulton,* 474 U.S. 159, 170, 106 S.Ct. 477, 484, 88 L.Ed.2d 481 (1985)). Others besides the prosecutor contributed to this regrettable result.