UNITED STATES of America, Plaintiff–Appellant,

Robin L. Harris, Appellant,

v.

Virgilio TALAO, Defendant–Appellee.

United States of America, Petitioner,

v.

United States District Court for the Northern District of California; Respondent,

Virgilio Talao; San Luis Gonzaga Construction Co.; Gerardina Talao; Maria Talao, Real Parties in Interest.

Nos. 99–10351, 99–70974.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted March 15, 2000

Filed Aug. 23, 2000

James M. Wagstaffe and Pamela Urueta, Kerr & Wagstaffe LLP, San Francisco, California, for the appellant.

Mary McNamara, Swanson and McNamara, San Francisco, California, for the defendant-appellee.

J. Douglas Wilson, United States Attorney's Office, San Francisco, California, for the petitioner.

John T. Philipsborn, San Francisco, California, for real party in interest.

Louis S. Katz, San Francisco, California, for real party in interest.

Before: POLITZ,[1] REINHARDT, and HAWKINS, Circuit Judges.

POLITZ, Circuit Judge:

AUSA Robin Harris appeals the decision of the United States District Court for the Northern District of California that she violated Rule 2–100 of the California Rules of Professional Conduct. The United States petitions this court for a writ of mandamus to prevent the district court from giving a jury instruction intended to remedy what the trial court viewed as Harris' Rule 2–100 violation. For the reasons assigned, we hold that Harris did not commit an ethical violation. Accordingly, there is no longer any basis for a remedial jury instruction and the petition for mandamus is moot.

## BACKGROUND

San Luis Gonzaga Construction, Inc. (SLGC) is a corporation wholly-owned by Virgilio Talao. In February 1996, several SLGC employees filed a complaint with the United States Department of Labor, Wage and Hour Division alleging that SLGC did not pay the prevailing wage, required them to kickback a portion of their wages, and made false statements to the government regarding the wages earned and hours worked by the employees. A similar complaint was filed with the Laborers' Contract Administration Trust Fund Board of Adjustment.

On June 27, 1996, the Asian Law Caucus initiated a qui tam action against SLGC, Virgilio Talao, and Gerardina Talao,[2] based on the same facts as alleged in the employees' complaints.[3] On October 14, 1996, the criminal division of the United States Attorney's office, acting on a referral from the civil division, initiated a criminal investigation of SLGC and the Talaos relating to these charges. SLGC and the Talaos were represented in all of these matters by attorney Christopher Brose.

The prosecutor assigned to the criminal action was Assistant United States Attorney Robin Harris. In early 1997, Brose initiated discussions with government attorneys, including AUSA Harris, regarding the possibility of settling the pending civil and criminal investigations of SLGC and the Talaos.

On April 21, 1997, Department of Labor Special Agent Alfredo Nodal served a subpoena on SLGC's bookkeeper, Lita Ferrer, directing her to testify before the grand jury on April 30, 1997. When Virgilio Talao learned of the subpoena he instructed Brose to be present for Ferrer's testimony. On April 29, 1997, Brose telephoned Ferrer and arranged to meet with her the next day, prior to her grand jury appearance.

Later that same day, however, Ferrer repaired to the federal building and asked to see Harris. Because Harris was not available, Ferrer spoke to her immediate

---

1. Honorable Henry A. Politz, Senior United States Circuit Judge for the Fifth Circuit Court of Appeals, sitting by designation.

2. Gerardina Talao is the secretary/treasurer of SLGC and the wife of Virgilio Talao.

3. The United States eventually intervened in the qui tam action on August 29, 1997.

supervisor, AUSA Sandra Teters. Ferrer asked to have the date of her grand jury appearance changed because she did not want Brose to be present before or during her grand jury testimony. She explained that she would feel pressured to give false testimony if Brose were present. She said she had received a telephone call from Talao in which he told her to "stick with the story" she had told while testifying in one of the related administrative actions. Teters told Ferrer that she would have to testify the following day, but informed her that Brose would not be present during her testimony as attorneys are not permitted to accompany witnesses before a grand jury.

On April 30, Ferrer met with Brose as scheduled to discuss her impending grand jury appearance. They made plans to continue their discussion at the federal building immediately prior thereto. Before Brose arrived at the federal building later that day, however, Ferrer encountered AUSA Harris and SA Nodal in the hallway outside the grand jury courtroom. Nodal introduced Ferrer to Harris. Ferrer then told Harris and Nodal that she did not wish to be represented by Brose. Ferrer agreed to discuss the matter further, and Harris and Nodal took her to a witness room.

Ferrer told Harris and Nodal that she was not and did not want to be represented by Brose. Harris then informed Ferrer of her right to be represented by an attorney, but Ferrer declined representation. When asked why she did not want Brose to act as her attorney, Ferrer stated that she wished to tell the truth and that she did not believe she could do so if she had to testify in his presence. She also said that the Talaos had been pressuring her to testify untruthfully. Ferrer gave Harris and Nodal information about the rates paid by SLGC, her preparation of corporate payroll records, and the possible destruction of corporate documents. During the interview, Brose knocked on the door and demanded to speak with Ferrer. Ferrer was informed of Brose's presence and desire to speak with her, but she said she did not wish to speak with him.

Uncertain whether she should continue the interview, Harris sought guidance from her superiors. The chief of the criminal division, AUSA Joel Levin, opined that Brose was wrongfully tampering with a witness and instructed Harris to continue the interview outside Brose's presence. During the remainder of the interview, Ferrer gave further instances of wrongdoing by her employers and explained how they concealed the truth from investigators and Brose. She stated that Virgilio Talao had told her to tell untruths to the grand jury and that she believed Brose had been directed there by Talao to intimidate her and to keep her from telling the truth. A few minutes later she recounted these facts in her grand jury testimony.

On July 16, 1997, the grand jury returned a 20–count indictment against the Talaos and SLGC. In February 1998, the Talaos and SLGC filed a Joint Motion to Dismiss the indictment asserting that the contact between Harris and Ferrer had violated California's ethical rule against *ex parte* contacts with represented parties[4] and SLGC's constitutional rights. The court denied the motion, but found a violation of Rule 2–100 and stated that it would refer AUSA Harris' conduct to the State Bar of California. The court also declared that if the case went to trial it would inform the jury of Harris' misconduct and instruct them to take it into account in assessing Ferrer's credibility. Later, the court concluded that Harris had acted in good faith and determined not to refer the matter to the state bar.

---

4. Rule 2–100 provides:
 [w]hile representing a client, a member shall not communicate directly or indirectly about the subject matter of the representation with a party the member knows to be represented by another lawyer in the matter, unless the member has the consent of the other lawyer.
 Notwithstanding this provision, however, "communications otherwise authorized by law" are permitted. Rule 2–100(C)(3).

Harris appeals the finding that she acted unethically and violated Rule 2–100. The government filed a petition for a writ of mandamus to prevent the district court from giving its proposed remedial instruction at trial. The two matters were consolidated for consideration.

## ANALYSIS

### Jurisdiction Over Harris' Appeal

SLGC and the Talaos insist that the district court's finding that Harris violated Rule 2–100 does not constitute a sanction against her and therefore does not provide a basis for appeal. In making this assertion, they rely on the decision in *Weissman v. Quail Lodge, Inc.,*[5] substantially employing the reasoning in *Williams v. United States.*[6]

In *Williams,* a bankruptcy judge levied monetary sanctions against the government and two attorneys. In his published findings of fact supporting the sanctions, the judge characterized the attorneys' conduct as obstructionist and unjustified, referring to the testimony of one as "pure baloney," and ranked the other's "performance and credibility at about the same level."[7] The bankruptcy judge later vacated the sanction against one attorney and the sanction against the other was annulled on appeal to the district court. Neither court, however, rescinded or vacated the factual findings or the harsh language used to describe the conduct of the two attorneys.

The attorneys contended on appeal that the bankruptcy court's findings of fact "besmirch[ed] their professional reputations to such an extent that they operate[d] as a de facto sanction."[8] The *Williams* court disagreed, noting that "not every criticism by a judge that offends a lawyer's sensibilities is a sanction."[9] The court declined to draw a line between routine judicial commentary and commentary that is inordinately injurious to a lawyer's reputation, holding that words alone may constitute a sanction only if expressly identified as such. The court recognized that this formalistic approach might exact a considerable price from some attorneys without affording them a means of redress, but chose to follow it in order to avoid line-drawing which it believed might prove exceedingly difficult and apt to chill judicial candor.

In *Weissman,* the district court sanctioned an attorney for what it considered to be "a serious lack of professionalism and good judgment."[10] The attorney had intervened in a class action without information to substantiate that his client was a class member, and then failed to appear at a hearing at which his objections were addressed. The district judge found counsel's objections "groundless, contrived, and misplaced" and also noted that he had demonstrated a pattern of such behavior in other cases.[11] The court issued an order restricting counsel's ability to file objections to proposed class action settlement agreements in ADA cases in that district.

The attorney appealed both the district court's order and the disparaging remarks therein. This court reversed the order insofar as it restricted counsel's ability to file objections for failure of notice and an opportunity to be heard, but concluded that we did not have jurisdiction to hear the appeal of the trial court's criticism. We adopted the reasoning in *Williams* and held that "words alone will constitute a sanction only 'if they are expressly identified as a reprimand.' "[12]

■ *Weissman* and *Williams,* however, do not determine our jurisdiction in this case. Those cases addressed only instances in which mere judicial criticism consti-

5. 179 F.3d 1194 (9th Cir.1999).

6. 156 F.3d 86 (1st Cir.1998).

7. *Id.* at 88.

8. *Id.* at 90.

9. *Id.*

10. *Weissman,* 179 F.3d at 1196.

11. *Id.*

12. *Id.* at 1200.

tutes an appealable sanction. The district court in the present case, however, did more than use "words alone" or render "routine judicial commentary." Rather, the district court made a finding and reached a legal conclusion that Harris knowingly and wilfully violated a specific rule of ethical conduct. Such a finding, *per se*, constitutes a sanction.[13] The district court's disposition bears a greater resemblance to a reprimand than to a comment merely critical of inappropriate attorney behavior. A reprimand generally carries with it a degree of formality.[14] The requisite formality in this case is apparent from the fact that the trial court found a violation of a particular ethical rule, as opposed to generally expressing its disapproval of a lawyer's behavior. Further, the district court's conclusion that Harris violated Rule 2–100 carries consequences similar to the consequences of a reprimand. If the court's formal finding is permitted to stand, it is likely to stigmatize Harris among her colleagues and potentially could have a serious detrimental effect on her career. In addition, she might be subjected to further disciplinary action by the California Bar. We have no reluctance in concluding that the district court's finding of an ethical violation by Harris is an appealable sanction.

Our conclusion on the issue of jurisdiction in this case does not implicate the difficulties that *Weissman* and *Williams* sought to avoid. We do not invite appellate review of every unwelcome word uttered or written by the district courts.

Indeed, a formal finding of a violation eliminates the need for difficult line drawing in much the same way as a court's explicit pronouncement that its words are intended as a sanction. In addition, we have no reason to believe that our finding of jurisdiction herein will come at the expense of judicial candor. As the *Williams* court noted, uncertainty over the verbiage that would constitute sanctions might cause judges to temper their criticisms in a way that could interfere with their ability to administer their courtrooms appropriately. We think it is unlikely, however, that judges will be similarly unsure about the meaning and effect of formal findings like the one against Harris.

### Rule 2–100 Violation

 In determining the applicability of Rule 2–100, we must be mindful of the fundamental reasons behind the venerable rule in legal ethics prohibiting *ex parte* contacts with represented parties. The rule exists in order to " 'preserv[e] ... the attorney-client relationship and the proper functioning of the administration of justice.' "[15] It is a rule governing attorney conduct and the duties of attorneys, and does not create a right in a party not to be contacted by opposing counsel.[16] Its objective is to establish ethical standards that foster the internal integrity of and public confidence in the judicial system.[17]

Preliminarily, we should point out that the parties dispute the applicability of Rule 2–100 to pre-indictment, non-custodial communications by federal prosecutors and investigators with represented par-

---

**13.** GREGORY P. JOSEPH, SANCTIONS: THE FEDERAL LAW OF LITIGATION ABUSE 260 (3rd Ed.2000) (recognizing that "[a]mong the most lenient sanctions that a court may impose is ... to make a formal finding of a violation not coupled with any additional sanction").

**14.** *Federal Labor Union 23393 v. American Can Co.*, 28 N.J.Super. 306, 100 A.2d 693, 695 (1953) ("Reprimand ... means to reprove severely; ... to censure formally" (citations omitted)). Indeed, the *Weissman* and *Williams* courts required express identification of reprimands in order to signify when mere words carried the requisite formality.

**15.** *Mills Land and Water Co. v. Golden West Refining Co.*, 186 Cal.App.3d 116, 230 Cal. Rptr. 461, 468 (1986), quoting *Mitton v. State Bar*, 71 Cal.2d 525, 78 Cal.Rptr. 649, 654, 455 P.2d 753 (1969).

**16.** *United States v. Lopez*, 4 F.3d 1455, 1462 (9th Cir.1993) (holding that criminal defendant did not have a right not to be contacted, and consequently could not waive application of § 2–100).

**17.** *Jeffry v. Pounds*, 67 Cal.App.3d 6, 136 Cal. Rptr. 373, 376 (1977); *Millsberg v. State Bar*, 6 Cal.3d 65, 98 Cal.Rptr. 223, 490 P.2d 543, 549 (1971).

ties. While it is true that this court has found Rule 2–100 not applicable to such communications in particular cases,[18] we have declined to announce a categorical rule excusing all such communications from ethical inquiry.[19] In *United States v. Lopez*, we held that "beginning *at the latest* upon the moment of indictment, a prosecuting attorney has a duty under ethical rules like Rule 2–100 to refrain from communicating with represented defendants."[20] We also observed that "courts have been divided over whether the rule applies even in a pre-indictment setting"[21] and cited, among other cases, the Second Circuit's decision in *United States v. Hammad.*[22]

In *Hammad* the court rejected the argument that an ethical rule analogous to Rule 2–100 was "coextensive with the sixth amendment" and therefore remained "inoperative until the onset of adversarial proceedings," *i.e.*, indictment.[23] Observing that the timing of indictment "lies substantially within the control of the prosecutor," the court explained that under an ethical rule that was dependent on indictment, "a government attorney could manipulate grand jury proceedings to avoid its encumbrances."[24] Rather than announcing a bright-line rule, the court preferred to apply the ethical rule through "case-by-case adjudication,"[25] policing clear misconduct while keeping in mind that prosecutors are "authorized by law" to employ legitimate investigative techniques in conducting or supervising criminal investigations.[26]

 The district court relied on *Hammad* in concluding that ethical concerns were raised by the communications between Ferrer and the government here. While we disagree with the district judge's ultimate conclusion as to whether a violation occurred, his reliance on *Hammad* was well-founded. We find the Second Circuit's approach to be the proper one. Here, although at the time of the communications no indictments had yet been issued, the government and SLGC had clearly taken adversarial positions. The Department of Labor was conducting its civil investigation of SLGC's wage practices. The Asian Law Caucus had filed its qui tam action. On behalf of SLGC, attorney Brose had initiated settlement talks with the government regarding both its civil and criminal investigations. Under these circumstances, involving fully defined adversarial roles, impending grand jury proceedings, and awareness on the part of the responsible government actors of SLGC's ongoing legal representation, Rule 2–100 governed AUSA Harris's pre-indictment, non-custodial communications with Ferrer.

At this point a brief historical reference appears in order. During the early part of the decade of the 1990's, intense discussions were had between state judicial authorities and the Department of Justice over a position taken by the DOJ in a written communication popularly referred to as the "Thornburgh Memorandum." In essence, that memorandum created serious problems by excusing federal attorneys from compliance with state ethics rules. The conflict that developed was dissipated

---

18. *United States v. Powe*, 9 F.3d 68, 69–70 (9th Cir.1993) (undercover investigative contacts); *United States v. Kenny*, 645 F.2d 1323, 1339 (9th Cir.1981) (phone call recorded by government informant).

19. *Powe*, 9 F.3d at 69–70 ("We need not decide the reach of *Kenny* ...."); *Kenny*, 645 F.2d at 1339 ("While the present case provides no opportunity for us to say just when the ethical line might be crossed, we do not believe it has been crossed here.") (citation omitted).

20. 4 F.3d 1455, 1461 (9th Cir.1993) (emphasis added).

21. *Id.* at 1460 n. 2.

22. 858 F.2d 834 (2d Cir.1988). *Lopez*, 4 F.3d at 1460 n. 2.

23. 858 F.2d at 838.

24. *Id.* at 839.

25. *Id.* at 840.

26. *Id.* at 839.

when the Congress adopted what is now 28 U.S.C. § 530B, and made state ethics rules applicable to government attorneys.[27]

Under the circumstances of this case, we conclude that Rule 2–100 did not prohibit Harris's conduct. Despite the apparent conundrum created by Ferrer's dual role as employee/party and witness,[28] the interests in the internal integrity of and public confidence in the judicial system weigh heavily in favor of the conclusion that Harris' conduct was at all times ethical. We deem manifest that when an employee/party of a defendant corporation initiates communications with an attorney for the government for the purpose of disclosing that corporate officers are attempting to suborn perjury and obstruct justice, Rule 2–100 does not bar discussions between the employee and the attorney. Indeed, under these circumstances, an automatic, uncritical application of Rule 2–100 would effectively defeat its goal of protecting the administration of justice. It decidedly would not add meaningfully to the protection of the attorney-client relationship if subornation of perjury, or the attempt thereof, is imminent or probable.

Few, if any, unethical acts by counsel are more heinous than subornation of perjury. It would be an anomaly to allow the subornation of perjury to be cloaked by an ethical rule, particularly one manifestly concerned with the administration of justice. As commentators have noted with regard to the crime-fraud exception to the attorney-client privilege, "[s]ince the policy of the privilege is that of promoting the administration of justice, it would be a perversion of the privilege to extend it to the client who seeks advice to aid him in carrying out the illegal or fraudulent scheme." [29] In a similar vein, it would be a perversion of the rule against *ex parte* contacts to extend it to protect corporate officers who would suborn perjury by their employees.

Appellees maintain that application of Rule 2–100 is necessary here in order to protect the attorney-client relationship between the corporation and its counsel. We are keenly aware that assuring the proper functioning of the attorney-client relationship is an important rationale behind the rule. Again, however, like the attorney-client privilege, the prohibition against *ex parte* contacts protects that relationship at the expense of "the full and free discovery of the truth." [30] For that reason, the attorney-client privilege "applies only where necessary to achieve its purpose." [31] When a corporate employee/witness comes forward to disclose attempts by the corporation's officers to coerce her to give false testimony, the prohibition against *ex parte* contacts does little to support an appropriate attorney-client relationship. Once the employee makes known her desire to give truthful information about potential criminal activity she has witnessed, a clear conflict of interest exists between the employee and the corporation.[32] Under these circum-

---

27. 28 U.S.C. § 530B(a) now provides in pertinent part that "[a]n attorney for the Government shall be subject to State laws and rules, and local Federal court rules, governing attorneys in each State where such attorney engages in that attorney's duties, to the same extent and in the same manner as other attorneys in that State."

28. *Mills Land*, 230 Cal.Rptr. at 466 (describing the problem as an "insoluble dilemma").

29. McCORMICK ON EVIDENCE § 95, 350 (Strong, ed.1992).

30. *Weil v. Investment/Indicators, Research & Management, Inc.*, 647 F.2d 18, 24 (9th Cir. 1981).

31. *Fisher v. United States*, 425 U.S. 391, 403, 96 S.Ct. 1569, 48 L.Ed.2d 39 (1976).

32. California Rules of Professional Conduct 3–310; *Wood v. Georgia*, 450 U.S. 261, 271, 101 S.Ct. 1097, 67 L.Ed.2d 220 (1981) ("[i]t is inherently wrong [for an attorney] to represent both the employer and the employee if the employee's interest may, and the public interest will, be advanced by the employee's disclosure of his employer's criminal conduct.") (quoting *In re Abrams*, 56 N.J. 271, 276, 266 A.2d 275 (1970)); *United States v. RMI Company*, 467 F.Supp. 915, 922 (W.D.Pa.1979) ("the representation of a defendant in a criminal case and of a government witness who is also the defendant's

stances, corporate counsel cannot continue to represent both the employee and the corporation. Indeed, Brose made clear in his testimony at the evidentiary hearing before the district court that if Ferrer had approached him with information adverse to the interests of the corporation he would have advised her that she should retain her own lawyer. Under these circumstances, because the corporation and the employee cannot share an attorney, *ex parte* contacts with the employee cannot be deemed to, in any way, affect the attorney-client relationship between the corporation and its counsel. In this setting, the corporation's interest, therefore, clearly does not provide the basis for application of the rule. The trial court erred in otherwise concluding.

▆ The fact that we approve AUSA Harris's conduct does not mean that we suggest that attorney Brose in fact committed any act of subornation of perjury. Ferrer felt pressured when Virgilio Talao told her by phone to "stick to her story," and she believed that she would feel pressured to give false testimony if Talao's attorney were present. Harris acted appropriately on the basis of the representations volunteered to her office by Ferrer. We strongly emphasize, however, that a witness's assertion that she is afraid of testifying in an attorney's presence does not, without more, suggest that the attorney has engaged in any ethical or legal violation. Indeed, it is not unknown for corporate employees involved in alleged wrongdoing to attempt to gain favor with U.S. Attorneys by claiming that corporate officials or corporate counsel directed them to act unlawfully. Clients are sometimes willing to throw lawyers to the wolves when they believe that doing so will let them avoid prosecution or a longer prison sentence. Claims of lawyer misconduct made under such circumstances should be viewed with a most critical eye.

▆ We should note that the U.S. Attorney here did the right thing in advising Ferrer that she had a right to be represented by an attorney and giving her the opportunity to contact substitute counsel. When a person who has been represented by institutional counsel perceives a conflict in that representation and approaches a prosecutor or investigator, the prosecutor or investigator should do as Harris did here: advise the person of his right to obtain substitute counsel. Furthermore, we do not mean to suggest that government officials have a license to approach an employee and initiate communications whenever there is a possible conflict of interest between the employee and the corporation for whom the employee works. In this case, Ferrer initiated the communications with the U.S. Attorney's office, and Harris responded properly by clarifying her ethical duties and advising Ferrer of her right to counsel. It is these circumstances and acts that make the district court's finding of an ethical violation improper in this case.

## CONCLUSION

Concluding that Harris committed no ethical violation, it follows that no remedial instruction is necessary or proper. For this reason, the government's mandamus petition is moot and need not be considered. The sanction against Harris is REVERSED, and the government's petition for writ of mandamus is DISMISSED AS MOOT.

---

employee could give [the appearance of impropriety] and is sufficient in itself to disqualify counsel from further representation of the witnesses").